STRINE, C.J.,
concurring in part and dissenting in part.
I- join the excellent Majority opinion, except in one respéct. Wanton negligence is a very, very difficult standard to fall short of. The definition requires that the person facing liability to act with “a ‘conscious indifference’ or an ‘I-don’t-care atti *552 tude.’”[1] I respect the judgment of my colleagues in’ the majority that thé Superi- or Court did not err in finding that there was no triable issue of fact as to whether Chief Szczerba could be held liable under that standard given the facts of record. But, I reluctantly come to a-different judgment.
The principal argument that Chief Szczerba uses to argue in his own favor is ignorance. That is, Chief Szczerba argues that he was the chief of a very large police organization and that it should be expected that he would not personally superintend the disciplinary process governing line officers. Even further, although correspondence would be addressed to him, he was not expected to read it. Nor, apparently, was he charged with ensuring that if he did not read it, there was a genuine system of officer supervision and discipline, that functioned credibly and in good faith, to, protect the .public, especially given the reality that police officers have special powers, get to carry lethal force, and get to drive automobiles in the line of duty in ways that members of the public cannot.
The facts of record here are troubling. For starters, when .Officer Spencer was hired, he hardly came to the force with an unblemished record. Although it can be deemed admirable that the' Wilmington Police force would take on an officer with multiple motor vehicle violations, prior drug use, and a drinking problem, one would think that it would then consider that history when Officer Spencer then fell short of the mark when he became an officer. But, when Officer Spencer began to engage in a pattern of behavior that suggested that his pre-hiring behaviors were recurring, there is no evidence that anything genuine was done to correct his behavior.
In three successive months in 2008, Officer Spencer got into trouble. After each instance, he got a written reprimand, which was not' accompanied by any requirement that he undertake treatment, demonstrate that he had changed his behavior, or face any real consequence. These incidents are notable.
Let’s consider them in turn. In September 2008, Officer Spencer did not show up to work on time. His superiors tried to roust him by phone. Twice that was tried.[2] But Officer Spencer did not answer his phone. Thus, an officer was dispatched to his home to see if he was there. It took that door knocking to get him out of bed. Although Officer Spencer initially claimed that he forgot to set his alarm clock — an excuse that does not explain why he did not answer his ringing phone— he later acknowledged that he had been out drinking and at “a club” the night before.[3] When all was taken together, *553 Officer Spencer’s police superiors had several hints that he had missed his shift because he was too hungover to make it to work.
Then, in October, Officer Spencer was reprimanded for his investigation involving a physical altercation between three off-duty officers and a civilian at a Wilmington bar. One of the off-duty officers summoned him via text message.[4] Officer Speneer violated Wilmington Police Department protocol by not notifying dispatch that he was going to the location, not interviewing any of the three off-duty officers, and otherwise failing to properly investigate the incident.
And then, in November, Officer Spencer’s girlfriend had a fight with his daughter’s mother at his home. Officer Spencer’s girlfriend alleged that he “placed his hands on” his daughter’s mother.[5] His girlfriend called the Wilmington Police Department, which sent an officer to investigate. Officer Spencer’s girlfriend told the investigating officer that she had “encountered Officer Spencer to be intoxicated and ‘talking out of his head.’ ”[6] Officer Spencer then “grabbed [his] gun,” left his house, and drove to his superior’s home, where he showed up unannounced.[7] That is, Officer Spencer — while appearing drunk — got fin a vehicle with his weapon and drove off. When he got to his superior’s home, Officer Spencer “seemed highly upset and was crying.”[8] Despite a finding that Officer Spencer did not violate the Department’s directive on domestic violence, he was reprimanded for failing to inform the appropriate officer about the domestic dispute at his ex-girlfriend’s home. What is notable about each of these incidents is that they seem to involve a lack of judgment, a propensity to mix the use of alcohol with driving and the carrying of a gun, and the notion that situations involving police officers should be handled differently than those involving ordinary citizens.
Admittedly, Officer Spencer then had a period of nearly eighteen months in which he did not get disciplined. During that period, he was allowed to proceed from probationary status to full patrolman. But, then, on April 3, 2010, there was another incident. Officer Spencer had been drinking alcohol at the Delaware Association of Police. He then drove off in a police car and rear ended another vehicle. The State Police investigated the.accident, and cited Officer Spencer for inattentive driving because he had been-texting. Aiid Officer Spencer failed to contact the watch commander in violation of the Department’s protocol that an off-duty officer involved in an accident in New Castle County do so.
Then came the night which occasions this case. Officer Spencer’s behavior that evening can only be described as creepy at best, and incredibly scary and criminal at worst. On the evening of June 4, 2010, Officer Spencer attended . a “Beef and Beer” police fundraising event, at which he consumed at least three different kinds of *554 alcohol.[9] He then drove under the influence of alcohol to a bar in Trolley Square.[10] After leaving that bar — and again driving under the influence[11] — Officer Spencer headed toward a friend’s house. At 2:00 a.m, on June 5, 2010, he drove through a red light and struck Morgan McCaffrey’s vehicle.
After the accident, Officer Spencer called WPD dispatch. The dispatcher who took Officer Spencer’s call “could, tell that he might be drunk because the way he was acting on the phone and the way he was talking.”[12] But, the dispatcher did not infprm.his supervisor about the call because “he didn’t want to get the officer in trouble.”[13] While waiting for the police to arrive, Officer Spencer kissed McCaffrey on the lips and “asked Ms. McCaffrey whether she would like to handle the matter civilly.”[14] She agreed, and Officer Spencer cancelled the call to the police. Officer Spencer then asked McCaffrey if they could go to her nearby apartment to discuss the accident and she .said that they could.
Once inside McCaffrey’s apartment, McCaffrey went into her bathroom. When she came out a few minutes later, Officer Spencer was naked on her bed.[15] Officer Spencer asked McCaffrey whether she wanted to have sex, and she said no. He then straddled McCaffrey on her bed and again asked her. if she wanted to have sex, and she again said no. McCaffrey then went back into her bathroom. When she came out five minutes later, Officer Spencer was asleep on her bed.
McCaffrey called the police. Hour WPD officers responded to her call, and McCaf-frey gave these officers Officer Spencer’s gun, magazine, and police badge, which he had given her earlier in the night. The officers then “questioned Ms. McCaffrey in a way that indicated that the officers were unsympathetic to Ms. McCaffrey’s concerns and fears. It also appears that the officers did not believe Ms. McCaffrey’s version of events because she was a female and Officer Spencer was male and a WPD officer.”[16]
The officers woke Officer Spencer, but failed to perform any field sobriety tests on him immediately. . Spencer smelled of alcohol and initially tried to put his shirt on as pants.[17] The responding officers took him from McCaffrey’s apartment to *555 Wilmington Hospital at 5:00 a.m. He was released at 5:39- a.m. and finally questioned by an officer at 7:15 a.m. After initially refusing any field sobriety tests, he eventually complied and was given and passed eight tests. At his deposition, Officer Spencer said that he did not remember taking any of these tests.[18]
Now, of course, .Chief Szczerba will say, I knew nothing about this and would not tolerate this kind of behavior. But what is the record evidence of how the organization he ran responded that night, and especially that of the captain who involved himself? One of the responding officers, a lieutenant, called the on-call captain at 4:30. Because Officer Spencer was visibly drunk enough that the responding officers decided to take him to the hospital, the lieutenant wanted to test Officer Spencer’s blood for alcohol immediately! But, the captain instructed her — not once, not twice, but three times — to hold off on testing him.[19] Consequently, no officer performed any field sobriety or blood alcohol tests on Officer Spencer until six hours after the accident. And, according to McCaffrey, the responding officers treated her with disrespect -and made her wait until-8:00 a.m. to be interviewed about.the incident.
Of course, it is of more limited -relevance what happened after that fateful night, but not of no relevance. Officer Spencer was suspended without pay for thirty-one days and given one year of probation for any like offenses involving the consumption of alcohol. But, unfortunately, Officer Spencer’s suspension did not mark an end to his misbehavior. In August 2010, he was disciplined for negligently damaging a police vehicle following a car ‘chase. In November 2013, according to McCaffrey, Officer Spencer was charged with 'a DUI after having a blood alcohol content almost four times 'the legal limit. Still he kept his badge. Finally, judicial notice can be taken that in June 2015, Officer Spencer drunkenly broke into a home in Middle-town, believing it to'be'his own.[20] Officer Spencer, by then a WPD corporal, was placed on administrative duty after being charged in the break-in.[21]
’ Given this record, I reluctantly conclude that there is a triable issue,of fact whether Chief Szczerba acted with wánton negli *556 gence. It can only be a defense to know nothing, if' you know nothing because you take good faith efforts to ensure that the system below you functions in good faith and credibility. It is only a defense to not reading your mail if you ensure that someone else beneath you does and is charged with acting in good faith on the substance of what is communicated.
Here, there exist large questions as to the credibility of the officer discipline process that raise a fact question about the good faith of that process and the tone set at the'top of the organization. Huge red flags regarding the repeated, inappropriate use of alcohol by Officer Spencer were not followed up on by officers who were trained to be on the lookout for suspicious behavior. It does not take a great detective to,smoke out a hangover on the part of someone who can’t wake up when multiple calls to his house are made, and who comes to the door only after an officer goes and bangs on it. What citizen gets arrested for “inattentive driving” after having a few drinks and does not get tested for alcohol use? What is a police culture where an officer responds to a bar fight and does not follow up because some of the participants are fellow officers? In what state of the world is no field sobriety or blood alcohol test timely given when a male gropes a female, undresses and climbs on top of her in her bed, and falls asleep drunk there in her home? In what state of the world does a police captain — a high ranking officer — get involved in whether officers at the scene follow regular order?
The issues here of culture and credibility of the system were slighted by the Superi- or Court. That is understandable because the wanton negligence standard is high and it is easy to see why the narrow focus would be on precisely what Chief Szezerba knew about each incident and when. But what is lost in that are a few things. First, it is a jury question whether Chief Szezerba was telling the truth when he said he did not read things. Second, not reading your mail raises as many questions as it answers. Many of us who grew up in the Seventies and watched reruns on UHF channels had affection for the humbly Sergeant Schultz,[22] but that defense is one for a jury, not a Rule 56 victory. Third, when someone is subject to five actions for discipline, particularly three in three months, and has a prior history of problems, a question is raised about why a system has no triggers to identify chronic offenders and to ensure their repetitive behaviors are addressed. Fourth, the instances in which Officer Spencer was disciplined raise serious questions themselves of a “broom” approach to investigation. In each instance, it seems like the sort of skeptical and thorough approach to investigation that police usually take when investigating ordinary citizens was dispensed with when dealing with Officer Spencer. Red flags were not followed up on, questions were not asked, and Officer Spencer’s word was taken (or not even solicited). Finally, it appears that, no weight was given to what the behavior of high-ranking subordinates of Chief Szezerba on the critical night said about Chief Szczerba’s own good faith in overseeing the officer discipline process and the culture he instilled.
The reality is that a reasonable juror could conclude that the boorish, creepy, and dangerous behavior of Officer Spencer *557 on the night m question — one where a heavy use of alcohol influenced the use of a motor vehicle and the power that comes with being a police officer in a way that endangered the public — was not unexpected of Officer Spencer. To the contrary, it was exactly the kind of knucklehead, irresponsible, and stupid behavior that his pri- or course of conduct might predict would eventually occur. It may be that a jury, upon a fuller explanation, would conclude that Chief Szczerba acted in a way that could not be considered wantonly negligent.
But, it also may be that the jury would conclude that Chief Szczerba was conscious that the officer disciplinary process over which he presided was not operating in good faith; operated because it had to, and worked to sweep serious problems under the rug, leaving the public at risk of dangerous encounters with officers with serious personal and behavioral problems that made them unfit to wield deadly force.[23]
It is not an easy thing to prove wanton negligence. But, the record here is troubling enough to at least create a jury question that should not be answered by a judge on a summary judgment motion. I respect that my colleagues in the majority have reached a different conclusion in good faith, and I wish I could join them. The facts of record, however, are too unsettling to allow me to do so.

. See App, to Opening Br. at 121 (Notification of Complaint) ("At approximately 0805 hours, your Field Training Officer (FTO) ... attempted to contact you via your provided telephone number which met with no response and it went directly to voice mail as if your phone was in off mode. This writer ... also attempted to contact you with negative results and then verified you were not off on compensatory time or vacation.").

.See id. at 689 (Deposition of Michael Spencer, Oct. 19, 2012) ("Q. Was alcohol involved in that incident? A. The reason I was late to work? Q. Yes. A. I was hanging out the night before, went to a club, went to Trolley Square, and woke up late for work. Q. You didn't attribute that to alcohol at all? A. I *553 mean, it may have played a part. I’m not saying it was the sole reason.”).

. See id. at 138 (Citizen Complaint Investigative Report) (‘‘[B]y Officer Spencer's own admission, he was texted by the off-duty officers with a message saying ‘Dude, I'm going to fuck this guy up, come quick.’ ”).

. Id. at 150 (Citizen Complaint Investigative Report).

. Id.

. Id. at 691 (Deposition of Michael Spencer, Oct. 19, 2012).

. Id. at 152 (Citizen Complaint Investigative Report).

. Id. at 660 (Deposition of Michael Spencer, Oct. 19, 2012) ("Q. Also, I’ll represent in the records you stated that you drank beer, Captain Morgan and some other mixed drink. Would that be your normal — A. That's not my normal, but if that’s what I said I had that evening then that’s what I had.").

. See id. at 660-61 ("Q. When you left the beef and beer were you driving under the influence of alcohol? A. Yes, because I had consumed alcohol at the beef and beer.”).

. See id. at 662 ("Q. When you left Catherine Rooney’s would you say you were driving under the influence of alcohol? A. Yes.”).

. Id. at 738 (Deposition of Christopher M. Partlow, Jan. 10, 2013).

. Id. at 441-42 (Departmental Information Report, June 16, 2010).

. McCaffrey v. City of Wilmington, 2014 WL 6679176, at *2 (Del.Super. Nov. 3, 2014).

. See App. to Opening Br. at 287 (Departmental Information Report, June 6, 2010) ("Upon entering the apartment, this officer observed Ptlm Spencer laying naked on the bed covered by a sheet”).

. McCaffrey, 2014 WL 6679176, at *3.

. See App. to Opening Br. at 287 (Departmental Information Report, June 6, 2010) ("Sgt. ... flashed his light into Ptlm Spencer’s face several times to awaken him, however he did not [wake up]. This officer then yelled his name at which point, he finally came too and appeared to be extremely groggy from alcohol. There was an odor of. alcohol coming from his person and his eyes were blood shot. This officer handed him his *555 clothes so he could get dressed. Ptlm Spencer attempted to put a short sleeve white shirt on by putting his legs through the shirt instead of over his head.”), ■

. See id. at 669 (Deposition of 'Michael Spencer, Oct. 19, 201-2).

. See id. at 425 (Statement of Lieutenant) ("At 0429 hours, I notified the Duty Captain, ... to advise him of the situation. I stated to [the captain] that I wanted to take blood since [Officer Spencer] had been drinking. [The captain] denied this request by stating that we can wait on that because he wanted to notify • the Office of Professional Standards. I stated to [the captain] that my window was closing on my time to draw blood.”); id. at 425-26 ("At 0504 hours, I telephoned [the captain] to advise that Spencer was awake and there was evidence of blood on 'his shirt. [The captain] advised to transport Spencer to the hospital to make sure he is ok. For the second time, I advised [the captain]" that I wanted to take blood or put Spencer on the box. [The captain] again denied my request-and advised me to wait for.the Office of Professional Standards to arrive.”); id. at 426 (“At 0526 hours, I notified [the captain] again about my time-line with putting Spender on the box or drawing his blood. [The captain], a third time denied my request by stating that John and Paul were enroute to handle.”).

. See Brittany Horn & Esteban Parra,' Wilmington Officer Charged With Breaking-Into Home, The News J., June 10, 2015, available at http://www.delawareonline.com/story/news/ crime/2015/06/08/wilmington-officer-eharged-breaking-home/28720215/?frpm=global ■ & sessionKey= & autologin=.

. Id.

. Hogan’s Heroes (CBS television broadcast Sept. 17, 1965) (“I hear nothing, I see nothing, I know nothing!”).

. My respected colleagues in the Majority suggest that there is no triable issue of fact regarding whether Officer Spencer’s repeated problems could be traced to alcohol abuse in real time, rather than in hindsight. I respectfully part company on that point. It may well be the case that a jury would find that each incident was properly investigated in the same manner in which inquiring minds like detectives and officers on the beat deal with citizens in situations where alcohol use is frequently associated with problematic human behavior. But, to my mind at least, a fact question exists as to whether the discipline system overseen by Chief Szczerba was one that, as a regular matter, applied a different investigative standard when it examined officer behavior than it used when investigating citizen behavior. As the Majority itself cites, there are several undisputed examples of just that in this record, which include behavior by Officer Spencer himself, by a police dispatcher, and by a police captain. A jury should decide whether any lack of knowledge was the result of something being undiscoverable, mere negligence, or a pattern of institutional indifference amounting to wanton negligence on the part of Chief Szczerba.